

# IN THE
# TENTH COURT OF APPEALS

## No. 10-13-00121-CR

**JOHN JAMES SCHOEPLEIN,**

                                                            **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                                            **Appellee**

**From the 19th District Court**
**McLennan County, Texas**
**Trial Court No. 2011-1359-C1**

## MEMORANDUM  OPINION

Appellant John James Schoeplein was charged by indictment with two counts of aggravated sexual assault (Counts I & II) and two counts of indecency with a child (Counts III & IV).  A jury acquitted Schoeplein on Count I of the indictment, which alleged that he intentionally or knowingly causing the penetration of the sexual organ of L.L., a child younger than fourteen years of age and not his spouse, by means of his sexual organ.  But the jury found him guilty on Counts II, III, and IV of the indictment and assessed his punishment at life imprisonment, twenty years' confinement, and

twenty years' confinement, respectively. The trial court ordered the sentences to run consecutively. This appeal ensued.

## Sufficiency of the Evidence

In his first three issues, Schoeplein contends that the evidence is insufficient to support his convictions on Counts II, III, and IV. The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it

is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

In this case, the State had to prove for Count II that, on or about October 1, 2004, Schoeplein intentionally or knowingly caused the penetration of the sexual organ of L.L., a child under the age of fourteen and not his spouse, by means of his finger. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B) (West Supp. 2013). For Count III, the State had to prove that, on or about October 1, 2004, with the intent to arouse or gratify his sexual desire, Schoeplein intentionally or knowingly engaged in sexual contact with L.L., a child younger than seventeen years of age and not his spouse, by touching L.L.'s genitals by means of his hand. *See id.* § 21.11(a)(1), (b-1), (c)(1) (West 2011). For Count IV, the State had to prove that, on or about October 1, 2004, with the intent to arouse or gratify his sexual desire, Schoeplein intentionally or knowingly engaged in sexual contact with L.L., a child younger than seventeen years of age and not his spouse, by touching L.L.'s breast by means of his hand. *See id.*

The evidence presented was as follows: S.L. testified that she married J.S. right out of high school, and they quickly had two children—son T.L., born October 11, 1991, and daughter L.L., born September 16, 1992. S.L.'s and J.S.'s relationship was abusive, however, and they soon divorced. Any meaningful relationship between J.S. and T.L. and L.L. also quickly ended.

S.L. stated that she thereafter met Schoeplein while L.L. was still a toddler. S.L. and Schoeplein married when S.L. became pregnant with her second son. S.L.'s mother

testified that L.L. began calling Schoeplein her dad. S.L. and Schoeplein also had a daughter together during their marriage, but the two eventually separated and then divorced in April 2003.

S.L. testified that after the divorce, she "broke." She was very depressed and often laid in bed. S.L.'s mother stated that she had concerns about S.L.'s mental health and parenting abilities. S.L. dealt with her depression by sleeping a lot, resulting in S.L.'s house being dirty, the children being dirty, and S.L.'s parents having to furnish food for the children. S.L. acknowledged that she was not an active or good parent to T.L. and L.L. at that time.

S.L.'s parents both testified that T.L. and L.L. lived with them for a time after S.L.'s and Schoeplein's divorce. All four children also continued to see Schoeplein. L.L. testified that in contrast to her mother's house, Schoeplein's house was spotless and had a whole cabinet full of food.

L.L. stated that Schoeplein had told her that he was not her biological father at about the same time that he had separated from S.L. in 2002. L.L. was nine years old at that time. L.L. said that after the divorce, Schoeplein then treated her more like a friend than a daughter. L.L. testified that when she was at Schoeplein's house, she was able to do whatever she wanted. Schoeplein would provide them alcohol to drink even though L.L. was only eleven or twelve years old at the time, but Schoeplein would not let T.L. drink as much as he would let her drink. Schoeplein would also buy L.L. more new things than her siblings. He would take her shopping for new clothes and shoes. S.L.'s mother testified that Schoeplein was showing favoritism to L.L. at that time. S.L.'s

mother stated that there was a period around that time when Schoeplein was picking L.L. up from school and bringing her home late. Schoeplein would also call L.L. frequently, and they would talk on the phone for long periods of time. Schoeplein did not act the same way with T.L.

L.L. testified that the sleeping arrangements when the children stayed at Schoeplein's house were generally as follows: T.L. would sleep on the recliner, L.L.'s half-brother would sleep on the floor, and L.L. and her half-sister would sleep in the bed with Schoeplein. L.L. stated that Schoeplein always wore just his underwear to bed. L.L. noted that there were times when she and Schoeplein were in the bed alone. L.L. said that when she was eleven years old, Schoeplein would often rub her back. He would put his hand underneath her shirt and bra and rub from the top of her shoulders down to "where your butt and your back meet." L.L. said that Schoeplein's hands would also sometimes "go off to the side" underneath the underwire of her bra and onto the side of her breast. L.L. denied that Schoeplein ever put his hand on the full front of her breast. L.L. stated that these backrubs happened for about a year.

L.L. testified that one night when she was twelve years old, she was lying in the bed with Schoeplein when he began rubbing her back. L.L.'s half-brother and half-sister were sleeping on the floor. L.L. was lying on her stomach when she felt Schoeplein's hand slide underneath her pants and reach around her hip. L.L. turned onto her side away from Schoeplein and scooted away from him, but Schoeplein scooted closer to her. L.L. said that Schoeplein then took off her pants and pulled down her underwear. Schoeplein put his hand between her legs, and L.L. felt a really sharp

pain in her vagina being caused by Schoeplein's hand. After Schoeplein moved his hand away, he then put his penis inside her for "like a second." When asked how she knew it was his penis, L.L. replied that "[i]t definitely wasn't his hand" and that it did not feel the same. L.L. said that Schoeplein's hand hurt worse than when he put his penis inside her. She said that when it was over, Schoeplein just scooted back, flipped over, and laid there while she put her pants back on.

L.L. stated that this incident was the only time when Schoeplein put either his penis or his fingers inside her vagina. L.L. explained, however, that, at other times, Schoeplein had put his fingers "around the outside" of her vagina and had also "grope[d]" her. L.L. clarified that in saying that Schoeplein had "grope[d]" her, she meant that he had frequently grabbed and slapped her butt. L.L. also testified that Schoeplein "fondle[d]" her, meaning that he would "grab my butt and rub underneath my bra and rub my back a lot." L.L. stated that the sexual abuse happened at Schoeplein's house in Waco. L.L. said that Schoeplein also allowed his friends to grab and slap her butt. The friends also touched her breasts and made inappropriate comments to her about them.

L.L. testified that she continued to go over to Schoeplein's house for about a year and a half after he had sexually assaulted her. When asked why she continued to go there, she replied, "I didn't have anywhere else to go." L.L. stated, however, that she felt the need to tell someone about the sexual assault because she hated herself and because she thought that it might happen again. L.L. also said that she did not fully understand how someone became pregnant and, because she was not menstruating, she

was concerned that she might be pregnant.

When L.L. was thirteen years old, she initially told a couple of her friends that she had had sex with one of Schoeplein's friends at a party. L.L. then approached S.L.'s boyfriend, who went directly to S.L., who in turn took L.L. to the Advocacy Center for an interview. During the interview, L.L. said that she had had sex with a boy named Josh on a Wednesday night at the Valley Mills First Baptist Church. L.L. testified at trial that she had made up the story and that Josh did not exist. L.L. said that she thought that if she said it was another kid, then he could not get in trouble yet she could still get whatever help her mother said that she needed. L.L. also stated that she was scared and not fully ready to talk about everything that had happened with Schoeplein. She did not want to feel like she was ruining her family and hurting her siblings. L.L. said that Schoeplein had also told her that if she ever told anyone about the abuse, he would tell everyone that she was a liar.

L.L. testified that after the Advocacy Center interview, she told her mother S.L. that S.L.'s boyfriend had touched her inappropriately. L.L. said that as soon as her mother starting asking her questions about it, she told her mother the truth—that it was a dream and that, "No, he never touched me." L.L. stated at trial that she wanted her mother to find out that Schoeplein was the one who had really sexually assaulted her but that S.L. completely dropped the subject once S.L. knew that L.L. was not accusing her boyfriend.

Former Valley Mills Chief of Police Tommy Roach testified that he was at the Advocacy Center while L.L. was being interviewed. He had concerns after the

interview about whether L.L. was telling the whole truth because she was "real evasive" in her answers to certain questions and would not look at the interviewer. Chief Roach therefore interviewed L.L. himself. During the interview, L.L. told him that the sexual assault did not actually happen in Valley Mills but rather in Waco. L.L. also said that the boy named Josh was not the perpetrator. Because the sexual assault did not happen in Valley Mills, Chief Roach referred the family to the Waco Police Department.

L.L. testified that she finally told her mother that it was Schoeplein who had sexually abused her. L.L. stated that since the time when she identified Schoeplein as her abuser, she has not taken that back or said it was anyone else. When asked why the jury should believe her, L.L. replied that she is stronger now and tired of her life being controlled by fear.

Psychologist Dr. William Lee Carter testified that he had not evaluated or counseled L.L. but that he was there as an educational source for the jury. He stated that grooming refers to the pulling of a child into victimization and that it commonly occurs by giving special status or favor to a child. When asked what in this case suggested that L.L. had been groomed, Dr. Carter replied that L.L. was basically allowed to do whatever she wanted when she went over to Schoeplein's house and that Schoeplein would give her alcohol and back rubs and treat her favorably. Dr. Carter also testified that it would be fair to say that L.L.'s different allegations could be interpreted as cries for help. All of the different allegations occurred within about one month, and then once L.L. identified her assailant in 2006 as Schoeplein, the details

remained consistent. Dr. Carter stated that he was not saying that L.L. was being truthful or untruthful. He acknowledged that it could cause concern that L.L. has changed her story several times, but he also said that L.L.'s consistency since identifying Schoeplein as the perpetrator was one of the things one would look for in a reliable outcry.

Amy Perkins, the Executive Director for the Advocacy Center for Crime Victims and Children and the custodian of records for the agency, testified that L.L. began therapy on January 27, 2009. L.L. had a total of fourteen therapy sessions, ending on April 11, 2012. She also attended six group sessions. Perkins said that L.L. would fill out a survey at each session for the therapist to use as a tool. These records were admitted into evidence. In these surveys, L.L. had at times responded "[n]ever" to the statements, "I feel that what happened was my fault" and "I feel dirty or ashamed about what happened to me." Perkins stated, however, that L.L. had also consistently shown concern in the surveys that she often felt like everyone knew what had happened to her. L.L. was also experiencing anxiety-based behaviors, and she struggled with the continued contact that Schoeplein had with her siblings. When speaking on the phone with Schoeplein, her siblings would tell him that they loved and missed him.

Schoeplein first argues that the evidence is insufficient to support his convictions on Counts II, III, and IV because the jury was not a rational trier of fact by believing L.L., an admitted and documented liar who: (1) materially changed her story from the date she alleged he assaulted her to the date of trial and (2) admitted to other lies,

including making another false accusation of the same nature against her mother's longtime and present boyfriend. But the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A jury may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Here, by finding Schoeplein guilty, the jury obviously believed L.L.'s testimony. As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002). Furthermore, a child victim's testimony alone is sufficient to support a conviction for aggravated sexual assault of a child or indecency with a child. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West 2005); *Abbott v. State*, 196 S.W.3d 334, 341 (Tex. App.—Waco 2006, pet. ref'd); *Tear v. State*, 74 S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref'd).

Schoeplein argues, however, that no rational jury could decide to believe L.L.'s testimony. Schoeplein states that this is not a question of witness demeanor. Rather, Schoeplein claims that the only evidence supporting the allegations in this case was from L.L., that L.L. is an admitted and documented liar, and that L.L. is therefore simply not believable by a rational jury. Schoeplein likens this case to the hypothetical in *Brooks v. State*, 323 S.W.3d 893, 906-07 (Tex. Crim. App. 2010):

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.

But this case is distinguishable from the *Brooks* hypothetical. The jury here did not disregard affirmative evidence establishing that Schoeplein did not commit the actions alleged in Counts II, III, and IV of the indictment. The jury in this case merely believed L.L.'s testimony during which she explained why she had told several lies before identifying Schoeplein as her abuser and confirmed that she has been consistent in her allegations since identifying Schoeplein as her abuser.

Schoeplein next argues that the evidence is insufficient to support his conviction on Count III because the State failed to prove that on or about October 1, 2004, in McLennan County, Texas, with the intent to arouse or gratify his sexual desire, he intentionally or knowingly engaged in sexual contact with L.L. by touching her genitals. More specifically, Schoeplein claims that the evidence is insufficient because L.L. did not testify, nor was there any outcry testimony, that Schoeplein actually touched her genitals within the meaning of the statute.

The Court of Criminal Appeals has held that the term "genitals" in the indecency statute "includes more than just the vagina in its definition; … [it] includes the vulva which immediately surrounds the vagina." *Clark v. State*, 558 S.W.2d 887, 889 (Tex. Crim. App. 1977). Additionally, child victims of crime are not expected to testify with the same clarity and ability as is expected of mature and capable adults. *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990); *Wallace v. State*, 52 S.W.3d 231, 235 (Tex. App.—El Paso 2001, no pet.). Consequently, a child's use of unsophisticated language will not render the evidence insufficient to establish guilt. Furthermore, as

stated above, a child victim's testimony alone is sufficient to support a conviction for aggravated sexual assault of a child or indecency with a child. TEX. CODE CRIM. PROC. ANN. art. 38.07; *Abbott*, 196 S.W.3d at 341; *Tear*, 74 S.W.3d at 560.

Here, L.L. testified that in addition to the time when Schoeplein sexually assaulted her, Schoeplein had at other times put his fingers "around the outside" of her vagina. This evidence is sufficient to establish that Schoeplein actually touched her genitals within the meaning of the statute.

Finally, Schoeplein argues that the evidence is insufficient to support his conviction on Count IV because the State failed to prove that on or about October 1, 2004, with the intent to arouse or gratify his sexual desire, he intentionally or knowingly engaged in sexual contact with L.L. by touching her breast. More specifically, Schoeplein claims that the evidence is insufficient because L.L. did not testify, nor was there any outcry testimony, that Schoeplein actually touched her breast within the meaning of the statute.

L.L. testified that when Schoeplein was giving her back rubs, his hands would sometimes "go off to the side" underneath the underwire of her bra and onto the side of her breast. L.L. denied, however, that Schoeplein ever put his hand on the full front of her breast. Schoeplein argues that this is not indecency with a child by contact on the breast. Schoeplein contends that even if we believe L.L., he at most touched her chest, which is insufficient proof to support his conviction. *See Nelson v. State*, 505 S.W.2d 551, 552 (Tex. Crim. App. 1974) (holding that testimony "He rubbed my chest" was insufficient proof to sustain averment in indictment that appellant did "place his hand

against the breasts" of victim).

We disagree with Schoeplein. L.L.'s specific testimony that Schoeplein touched the side of her breast is sufficient to establish that Schoeplein actually touched her breast within the meaning of the statute.

Viewing all the evidence in the light most favorable to the verdict, the evidence is sufficient to support Schoeplein's convictions on Counts II, III, and IV. We overrule Schoeplein's first three issues.

**Extraneous-Offense Evidence**

In his fourth issue, Schoeplein contends that the trial court erred and abused its discretion by allowing the State to present evidence of his giving other children alcohol because: (1) evidence of this alleged extraneous offense presented to the jury during the guilt/innocence phase was not admissible based upon the relationship between L.L. and him; (2) he did not "open the door" to the admission of such evidence; and (3) the probative value of admitting such evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and clearly misled the jury.

During the guilt/innocence phase of the trial, S.L.'s sister Suzanne testified as follows:

> Q. [BY Defense Counsel] Did you ever -- you spent time over at [S.L.] and John's house?
>
> A. Yes.
>
> Q. And it was fun?
>
> A. Yes.

[Defense Counsel]:  That's all, Judge.  I pass the witness.

REDIRECT EXAMINATION

BY [Prosecutor]:

Q.      Why was it fun at the defendant's house?

A.      Because we got to do what we wanted to do.

Q.      And by doing what you wanted to do, what would he let you do that you wanted to do as a teenager?

A.      Drink alcohol, smoke cigarettes, whatever we wanted to do.

Q.      And the alcohol and the cigarettes, did you furnish those or were those furnished to you?

A.      They were furnished to us or to me.

Q.      By who?

[Defense Counsel]:  Object, Your Honor.  Calls for extraneous.  This was all in the motion in limine the Court granted.

[Prosecutor]:  Your Honor, the defendant opened the door by asking about the fun at the defendant's house.

[Defense Counsel]:  No.  She testified on direct, Judge, that she enjoyed going over there.  I said, "You went over there because you had fun."  I didn't go into any details about that.  The State set that up.

THE COURT:  Overruled.

Q.      (BY [Prosecutor])  Who furnished the alcohol --

[Defense Counsel]:  Your Honor, at this point I'm going to object under 403, then.

THE COURT:  Overruled.

[Defense Counsel]:  I'm going to ask the Court to make findings on that, make that balancing test, Judge.

THE COURT: All right. I find this matter is admissible to explain the relationship here. I also find that the relevance outweighs any -- the probative value of the relevance outweighs any prejudicial value.

Q. (BY [Prosecutor]) Suzanne, who gave you the cigarettes and the alcohol?

A. John.

Q. You mean the defendant?

A. Yes.

….

Q. (BY [Prosecutor]) And is this the same John Schoeplein that would give you cigarettes and alcohol when you were a minor?

A. Yes.

Q. How old were you when this was going on, the cigarettes and the alcohol?

A. 12.

Q. So this is during the time that he was still married to your sister --

A. Yes.

Q. -- that it started?

A. Yes.

[Prosecutor]: Pass the witness, Your Honor.

RECROSS-EXAMINATION

BY [Defense Counsel]:

Q. And during this time your sister, [S.L.], was there drinking with you-all, wasn't she?

A.      Occasionally, yes.

[Defense Counsel]:  Pass the witness.

FURTHER REDIRECT EXAMINATION

BY [Prosecutor]:

Q.      You said that occasionally your sister was there.  Was that every time that you drank?

A.      No.

Q.      The majority of the time, was your sister there?

A.      No.

Q.      The majority of the time, was it you and the defendant?

A.      Yes.

After Suzanne, Sarah, another of S.L.'s sisters, then testified as follows:

A.      Well, [Schoeplein] was a very good friend to have for an independent teenage girl.  I mean, he would let us -- he wouldn't tell on me if I was smoking, and he allowed us to drink.

Q.      [By Prosecutor]  Now, when you say, "us," who do you mean?

A.      Well, anybody that was with me.  Any of my friends that were with me would be able to drink as well.

Q.      And there is no doubt the defendant knew you weren't 18?

A.      Oh, yeah.

Q.      You weren't close to 21 but not 18 either.

A.      Yeah.

Q.      You were in high school?

A.     Yeah.

Q.     So you were underage?

A.     Yes.

Q.     Did you bring alcohol over and drink it there, or was it provided to you?

A.     It was provided.

Q.     What was provided?

A.     It would depend.  There was wine coolers.  There was -- he made Amaretto shots.  That was one of my favorites.  He had a whole lot of liquor that he would make shots with and stuff.

Q.     And would your sister, [S.L.], know this was going on?

A.     She would turn a blind eye to it.  She got mad if she knew I was drinking.  She didn't allow me to drink, but she wasn't going to tell on me either.

Q.     Did you stay at her house and do this --

A.     Yes.

Q.     -- and not drive around?

A.     That is correct.

Q.     Okay.  Were these parties that your sister and the defendant kind of had for you and your friends, or were these parties with the defendant?

A.     It wasn't -- there was only one party that I can think of offhand that was actually a party we went to, and that was whenever he lived in his house on Erath before he moved in with [S.L.] out on the land.  Other than that, it was there at the house, so we just made a party.  It wasn't like he was planning a party.

Q.     Was your sister involved in these parties, [S.L.]?

A.	The one on Erath, yes.  She was there.  She didn't -- she didn't plan the parties, but, I mean, she was there, like, talking to everybody and everything like that.  If she knew I was going to be drinking, she didn't -- and especially like on the one at Erath, she got mad at me and didn't want people giving me alcohol, but I drank and didn't really care what she said.

Q.	Did the defendant get mad at you that you drank?

A.	No.

Q.	Did you know the defendant gave Suzanne, your younger sister, alcohol too?

A.	Suzanne didn't drink in front of me.  I did not know that he was -- that that was happening with her too.  She really wasn't a part of when I would go over there and drink because she was my little sister, and I would say, "Shoo."  I didn't really want her to be there because I didn't want her telling on me.

Q.	So at what point did you find out the defendant gave Suzanne alcohol too?

A.	It was -- you now [sic], I'm not actually for sure because I didn't really think it was a big deal, so I really didn't -- I really didn't think much about it.

[Prosecutor]:  I'll pass the witness.

RECROSS-EXAMINATION

BY [Defense Counsel]:

Q.	[Sarah,] just a few questions to follow up on what you have already testified to on direct.  You indicated that your sister, [S.L.], was present.  Is that correct?

A.	Yes.

Q.	And she was present on the times that you were drinking alcohol.  Is that right?

A.      Yes.  She was there at the house.

Q.      And as you testified to, she turned a blind eye to it and didn't tell your parents.  Is that correct?

A.      That is correct.

Q.      And [S.L.] was an adult at that point in time too.  Is that right?

A.      Yes.

Q.      So you stated that on occasion that she would get onto you for drinking.  Is that right?

A.      She wouldn't get onto me.  It wasn't like a lashing after the fact.  It was if she came in and saw me taking a shot, she was like, "Where did you get that?  What are you doing?"  It was one of those types of things.  But then when I told her, "I'm taking a shot," she would walk away, but I knew she was not happy with me.

Q.      But you knew that -- you knew she wouldn't tell your parents?

A.      Yes.

Q.      Okay.  And there were times that [S.L.] drank with you.  Is that correct?

A.      Not until I got older.

[Defense Counsel]:  I'll pass the witness.

FURTHER REDIRECT EXAMINATION

BY [Prosecutor]:

Q.      So, Sarah, are you making shots with this stuff sometimes?

A.      I did make shots after -- I mean, I would make mixed drinks.  After he would go to bed, you know, I would help myself to the alcohol, but mainly it was him.  He's the one who taught me how to make the Amaretto shots and the little cocktails.

Q. You're saying he's the one that taught you. You're talking about the defendant?

A. Yes.

....

Q. (BY [Prosecutor]) And how old would you have been when the defendant taught you how to make shots and mixed drinks?

A. 14.

[Prosecutor]: I'll pass the witness.

[Defense Counsel]: No questions.

....

THE COURT:

....

(Open court, defendant present, no jury)

Before we bring the jury back in, I want to get a matter on the record here. If this case goes to an appellate court, it might be helpful to have a clear record. Earlier when the issue of the extraneous conduct regarding the defendant provided alcohol to the aunts of the complaining witness – that is the relationship, isn't it?

[Prosecutor]: (Moving head up and down)

THE COURT: That came up. I wanted to kind of put on the record why I thought that was relevant and why I let it come in, because it was a little confusing about the way it all happened. When you look at this diagram on the board here that outlines the family tree of the folks involved in this case, and it's a pretty complex relationship, and a great deal of time has been spent up to this point both by the State and the defense explaining that relationship and the context in which it occurred, and cross-examination of the defense has emphasized that these aunts of the complaining witness frequently visited the home of the defendant and that they had a normal, wonderful, caring, close-knit relationship, and

that point was emphasized a number of times, and I think the jury could -- it was emphasized for a good tactical purpose on the part of the defense to show that there weren't any problems in the family, that it was a normal type relationship, and the last -- the witness -- I can't remember which one it was where the actual alcohol incident came in was Suzanne … ?

[Prosecutor]: Suzanne ….

THE COURT: The defense was emphasizing how much fun it was for these young ladies at the time -- they were young ladies at the time to go there, and then the State asked the question, "Why was it fun to go there," and that's when the issue came up, and in conducting a balancing test about whether the probative value outweighed the prejudicial effect, I made the balancing test and ruled as I did, and I did it because I think it gives context to the relationship of the parties and the whole issue here, and I think the jury was entitled to have a complete understanding of the relationship.

[Prosecutor]: Your Honor, I do think Rule 403 requires you to find that the probative value of the extraneous offense is substantially outweighed.

THE COURT: And I do make that finding.

[Prosecutor]: Okay. The danger of, and I think it would be misleading the jury, that that line of questioning could be misleading.

THE COURT: That's what I'm trying to say, maybe not very artfully.

[Prosecutor]: Okay. Or would leave a false impression of the kind of person the defendant was and what it was like to be over there.

THE COURT: Correct. I just wanted to get all that on the record.

Subsequently, T.L. also testified as follows:

Q.	[BY Prosecutor]  Was there drinking at the defendant's house with you?

A.	Yes.

Q. Was there drinking with your sister, [L.L.]?

A. Yes.

….

Q. So who would give you this alcohol?

A. John J. Schoeplein would give me the alcohol.

….

Q. Are you-all going out and buying this yourselves or is this something that is always at the defendant's?

A. That was something that was always there, you know, had some in the refrigerator. It was never bought to go out and intentionally --

Q. So it was never like you went to the store and picked out what you wanted?

A. No, it was nothing like that. No, ma'am.

Q. Were these drinks mixed for you by the defendant?

A. Yes, yes. I never mixed them myself, no.

Q. And how old were you when this started?

A. I would say approximately 13, 14, around that age.

Q. So that would have made [L.L.] 12 or 13?

A. Yes.

Any error in the admission of evidence is rendered harmless if the same or similar evidence is subsequently admitted without objection. *See Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) ("'An error [if any] in the admission of evidence is cured where the same evidence comes in elsewhere without objection.'") (quoting

*Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."). Therefore, assuming without deciding that the trial court abused its discretion in overruling Schoeplein's objections to Suzanne's testimony about Schoeplein providing alcohol to her as a child, we conclude that the error was harmless because Sarah and T.L. both testified without objection about Schoeplein providing them alcohol when they were minors and because Sarah even briefly responded to questioning about Schoeplein giving alcohol to Suzanne. We overrule Schoeplein's fourth issue.

Having overruled all of Schoeplein's issues, we affirm the trial court's judgments on Counts II, III, and IV of the indictment.

REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
     (Chief Justice Gray concurs with a note)*
Affirmed
Opinion delivered and filed July 24, 2014
Do not publish
[CRPM]

     *(Chief Justice Gray concurs in the judgment to the extent it affirms the trial court's judgment. A separate opinion will not issue.)